49 CCPA

**Application of Walter ERNST**
**Patent Appeal No. 6806.**

United States Court of Customs
and Patent Appeals.
July 18, 1962.

Toulmin & Toulmin, Harry A. Toulmin, Jr., and Folsom E. Drummond, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.*

KIRKPATRICK, Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the examiner's refusal to allow claims 24 through 28 of appellant's application Serial No. 507,283, filed May 10, 1955, for "Hydraulic Press and Method of Designing and Manufacturing Thereof." No claims have been allowed.

The sole reference relied on is:

Ernst 2,672,836 March 23, 1954

Claim 24, which is representative, reads:

"24. In a method of manufacturing correlated hydraulic presses; forming a plurality of press heads for the same tonnage capacity that differ only as to side to side and front to back dimensions so that said dimensions form substantially a geometric progression, forming a plurality of press beds for the same tonnage capacity that correspond in side to side and front to back dimensions to said press heads, forming a plurality of press uprights that differ from each other as to height according to a geometric progression and correspond in front to back dimensions to said heads and

beds, assembling the heads, beds and uprights to form a plurality of press structures of substantially the same tonnage capacity which differ from each other only as to dimensions that influence the size of the working space of the press, detachably mounting a hydraulic motor in each press head, detachably receiving a hydraulic power unit in each head to supply pressure fluid to the motor therein and providing blankholder and die cushion assemblies adapted for being detachably mounted on the beds of the presses whereby different tonnages and operating speeds may be obtained in a press of the same tonnage capacity."

Appellant's application discloses procedures for designing and manufacturing hydraulic presses of different capacity ratings and sizes suitable for different kinds of work. The procedure involves predesigning various parts in a relatively limited number of standardized capacities or sizes, which parts may be combined in various combinations to make available a large number of presses of differing characteristics.

A press construction to be utilized with appellant's procedure is described in the application as follows:

" * * * the basic press unit comprises the press head, the press bed, the uprights and strain rods, the fluid tank mounted on the press head, and the main press platen. The hydraulic motor for actuating the platen is detachably mounted in the press head, and thus can be replaced by one of a different type or one of a different size if desired in order to vary the basicing (basic) working characteristics of the press.

"The blankholder assembly, consisting of the blankholder platen, the pickup rods therefor, the blankholder pulldown rods, and the hydraulic pressure devices for the

-* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

blankholder, forms a unit adapted for ready assembly or ready detachment from the press frame. Similarly, the die cushion or ejector assembly, consisting of the die cushion platen, the ram connected therewith, the cylinder into which the ram extends, and the supporting beams therefor, can be assembled with the press or removed therefrom, depending upon the requirements of the job to be operated on the press."

In connection with the range of tonnages to be made available, appellant states that the widest selection is desired in the smaller press sizes with fewer models being required in presses of the larger sizes. He discloses establishing a series of tonnages on the basis of a preferred number series,[1] referring specifically to the number series consisting of the successive powers of the tenth root of ten. Actual tonnages in a series may be 125, 200, 300, 500, 800, 1250 and 2000 tons, or higher.

Appellant further discloses that, since a low tonnage press is normally operated at a higher speed than a high tonnage press, pressing speeds may be made inversely proportional to the square roots of the tonnages. On the assumption of a constant uniform working pressure for all press sizes, he discloses establishment of that relationship by varying the displacement horsepower with the square root of the tonnage.

According to appellant, his line of basic presses is so designed that each press is adapted for detachably receiving attachments such as low or high tonnage die cushion assemblies and blankholder assemblies. It is stated that the die cushion assemblies follow a preferred number system as to their rated tonnages.

Another aspect of appellant's procedure is the provision of a range of bed sizes and stroke-daylight combinations so that each press, "in addition to meeting the purchaser's requirements as to tonnage and function, will also meet his requirements as to physical size." The application discloses that the parts of the presses governing the dimensions are designed to result in the available dimensions also following a preferred number series, which may be a ten series, as is disclosed for use in connection with the selection of tonnages, or "a twenty series consisting of the successive powers of the twentieth root of ten."

The Ernst patent discloses a basic press design which is said to be more subject to modification for a particular job or class of work than presses previously available. That patent discloses that the press head and cylinder mounted therein are separate castings whereby the cylinder can be of the exact size necessary to do the work required and full advantage can be taken of the available hydraulic horsepower. It is also stated that the guides, which are mounted on the press uprights, are cut off at the correct length to give the required daylight and stroke combination with the result that "there is no pattern change or redesigning of the press necessary in changing the stroke-daylight relationship."

It is also disclosed that the construction of the Ernst patent permits optional use of certain accessories. Thus, the die cushion or ejector assembly "can be mounted in the press or removed therefrom." Also, no change in press design is required to add a blank holder if it is wanted in a press, and a blank holder already in a press can readily be removed. The patent further points out that the blank holder imposes no loading which influences the design of the press frame, with the result that it is unnecessary to redesign the press frame of a three hundred ton press "in order to associate with it a blank holder arrangement with a rating, say, of one hundred tons."

Another feature of the press of the Ernst patent is that the pump and its

conduits can readily be removed from the press for repair or replacement.

The Board of Appeals reversed the examiner as to two grounds for refusal of the appealed claims relied on by him; viz., that the claims were improper method claims because of the inclusion of recitations of mental steps and that they were drawn to an aggregation. A refusal to allow all the claims on the ground that they are unpatentable over the Ernst patent was affirmed by the board and that ground is the only one before us.

The board set forth its reasons for affirmance as follows:

"Considering illustrative claim 24 and the Ernst patent we are in accord with the examiner's views as to the recited method being no more than a description of expected production planning in a large scale plant arranged to produce a line of such presses in assorted sizes and tonnage ratings. The prior Ernst patent provides press design having parts of the character now claimed and this patent describes the benefit of such press design in permitting modifications. The extension of such machine adaptation to the extent of forming varied parts at a factory and selecting among them to produce a variety of assembled devices is no more than the practice in the automotive field of producing varieties in a line of cars as to the number of cylinders in the engine, the 'barrel' rating of the carburetors, and the type of transmission used. Production of cars in customer specified varieties directs the 'forming' of items such as engines in the size ranges customarily demanded. Where appellant carries the production engineering principles of such mass formation of parts to the field of press manufacture, it does not appear to us that any thing beyond routine engineering management is involved in 'forming' the basic parts in size ranges and 'assembling' the product therefrom. The further steps of adding motors and work holders are clearly analogous to the addition of fittings to cars or any other product. No procedure of an unobvious nature is involved. Viewed in this way the method of claim 24 is a sequence of part 'forming' and article 'assembling' and the argued engineering refinements of size gradation in terms of 'geometric progression' and such terms as 'front to back' dimension are no more than minor supporting explanation in connection with the prime procedural steps, and do not serve as significant limitations on the method claim to define novel procedure. The procedure recited and argued is 'forming' and 'assembling.' To the extent that the procedure is colored by the provision of particular steps in the size ranges of the parts and the provision of varied tonnage capacities, we share the examiner's view that such considerations amount to no more than expected engineering and economic considerations that would be derived from calculation and product demand studies. It appears obvious that even physical units of dimension, representing a large proportion in change, would be recognized as a coarser distinction between products in the line in the smaller sizes and no more than common design skills would be required to comprehend that units related by a common factor such as 1.5 or 2. would provide a more adequate gradation. The specified factor in claim 28 is described at pages 16 and 17 of the specification as compromised to produce units of even numbers. The presentation indicates that such exact ratio is not critical and we see no unexpected novelty as presented in the use of geometric progression in such a specified ratio. Claim 25 indicates constructing of parts and assembly in the same general way as claim 24. This claim expresses the potential

of the parts provided to form press structures in larger variation, than the number of parts provided, but here again we see no substantive concept involved that is not so anticipated in principle by the previously discussed assembly of cars as to render the adaptation thereof to press fabrication no more than an obvious engineering problem. Appellant has not indicated that the design of parts is any the less critical by reason of the plan of assembly being held flexible. It appears that product design has been placed on a mass production basis rather than reserved for individual orders, but we do not see therein any patentably significant improvement. If savings in time and design charges are accomplished they appear to us to be no more than the expected results of mass production and design standardization."

Appellant's brief asserts that he is a pioneer inventor in the field of hydraulic presses and the facts set out in affidavits clearly indicate that he has been extremely active in that field. It is also a fact that the Ernst patent relied upon by the board does not anticipate the claims in issue. However, we are unable to see that appellant in the present case has made any unobvious contribution over that patent. It seems to us that the board's analysis of the case is accurate and its conclusion that the claims are unpatentable over the Ernst patent is correct.

In his brief, appellant summarizes eight affidavits which were submitted to the Patent Office and comments that the board "overlooked or otherwise failed to mention and pass upon" them. These affidavits present background information concerning the press art and some of them set out opinions of the affiants as to what is or is not disclosed in the Ernst patent of record, but that subject matter does not impress us as demonstrating error in the board's conclusion that the subject matter in issue is obvious in view of the Ernst patent.

Appellant appears to regard an expenditure of $100,000. for design and experimental work, referred to in one of the affidavits, as constituting commercial success of significance here. Expenditure for development work is no evidence of commercial success. Moreover, we regard the subject matter here as clearly obvious over the prior art, and it is well established that, in such a case, commercial success cannot be persuasive of patentability. In re Coey et al., 190 F.2d 347, 38 CCPA 1200.

The decision of the Board of Appeals is affirmed.

Affirmed.

SMITH, Judge (concurring).

The result reached by the majority is, in my opinion, the correct one. However, I reach this result on a somewhat narrower ground than is to be implied from the majority's statement, "It seems to us that the board's analysis of the case is accurate and its conclusion that the claims are unpatentable over the Ernst patent is correct."

There are many problems which arise in the mass production of items such as the "correlated hydraulic presses" here claimed and in which neither the problems nor their solutions can be said to be "obvious", and may well involve more than the mere assembly of prefabricated units into a final manufactured entity. I do not agree that the decision of the board should be so broadly affirmed that the present opinion will become a binding precedent for the proposition that the mass production techniques of the automotive industry make mass production of all other items "obvious" and hence unpatentable.

In my judgment, each case requires a careful consideration of its own unique facts from which one can understand the particular problem to be solved as well as the proposed solution for that problem. It is only in view of such an understanding that it is possible to make the determination required by 35 U.S.C. § 103.

I have so analyzed the record here, and would affirm the decision of the board for the single reason that the rejected claims do not distinguish over the Ernst reference except as to the recital of features which are inherent in the expected engineering determinations and which I consider would be obvious to one of ordinary skill in the design of hydraulic presses.